## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVE HESSE and ADAM BUXBAUM, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br>     v.<br><br>GODIVA CHOCOLATIER, INC., and DOES 1 through 50,<br>            Defendants. | No. 1:19-cv-00972-AJN |

## DECLARATION OF JEANNE C. FINEGAN, APR, CONCERNING IMPLEMENTATION OF CLASS NOTICE

## INTRODUCTION

1.        I am Managing Director and Head of Kroll Notice Media Solutions ("Kroll Media") an affiliate company of Kroll Settlement Administration ("Kroll") *f/k/a* Heffler Claims Group LLC. This Declaration is based upon my personal knowledge as well as information provided to me by my associates and staff, including information reasonably relied upon in the fields of advertising media and communications.

2.        Pursuant to the Court's October 26, 2021 Preliminary Approval Order, ECF No. 72, ¶ 24, Kroll was appointed as the Settlement Administrator to provide notification and claims administration services for the class-wide settlement reached in *Hesse, et al. v. Godiva Chocolatier, Inc.*[1] Accordingly, Kroll Media was engaged by the parties to this litigation to develop and implement a legal notice program as part of the parties' proposed class action settlement.

---

[1] The qualifications of myself and Kroll are set forth in my October 7, 2021 declaration submitted in support of preliminary approval. *See* ECF No. 69.

3.      The purpose for this Declaration is to provide a report concerning the successful implementation of the notice program for this settlement, which commenced on November 9, 2021, and was substantially completed on January 12, 2022.[2]

4.      In short, the notice program employed best-in-class tools and technology to reach approximately 82% of targeted Class Members, *i.e., Purchasers of Godiva Chocolate Products*, nationwide, on average 2.8 times, through direct notice to 8,235,538 email addresses and reminder emails to 7,692,027 email addresses (15,927,565 emails sent to potential Class Members in total) and publication media notice serving over 35,000,000 online display, search and social media impressions with cross-device targeting on desktop and mobile, a settlement website, and a toll-free number.

5.      This Declaration will describe the successful implementation of the notice program. Further, it describes why this comprehensive program is consistent with other best practicable court-approved notice programs and the requirements of Fed. R. Civ. P. 23(c)(2)(B) and the Federal Judicial Center ("FJC") guidelines[3] for Best Practicable Due Process notice.

6.      This Declaration also describes the reaction of the Class to the settlement, including total visits to the Settlement website, the current number of claims, objections, and opt-outs submitted. As of February 21, 2022, there have been 1,217,265 users to the settlement website and more than 3,019,437 page views. There have been a total of 463,495 claims filed. Of the people that visited the settlement website, 38% chose to file a claim.

7.      I understand that on or about on February 21, 2022, Plaintiffs will file this

---

[2] As discussed below, Kroll was directed by the parties to send reminder emails, which was completed on February 5, 2022. Details about the reminder email campaign can be found in Paragraphs 18-19 below.

[3] FED. JUD. CTR., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), *available at* https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf. The guidelines suggest that the minimum threshold for adequate notice is 70%.

Declaration in connection with their Motion for Final Approval and/or Motion for Attorneys' Fees And Costs And Class Representative Service Awards. The deadline for Class Members to submit claims is February 23, 2022. The deadline for Class Members to object or opt-out is March 7, 2022. The Final Approval Hearing is on March 28, 2022. On or about March 21, 2022, which is after the close of the foregoing deadlines, but before the Final Approval Hearing, I intend to submit a supplemental declaration that provides updated claim, objection and opt out numbers.

## ADMINISTRATIVE DUTIES

8.     Kroll's duties in this Settlement have included and will include: (a) establishing a post office box for the receipt of general mail and correspondence; (b) creating a website with online claim filing capabilities; (c) establishing a toll-free number with an Interactive Voice Response (IVR) system and live operators; (d) administering the publication and media notice program; (e) receiving and processing correspondence, objections, and requests for exclusion; (f) receiving and processing claim forms; and (g) such other tasks as counsel for the parties or the Court orders Kroll to perform.

## NOTICE PROGRAM

9.     The notice program was designed to inform Class Members of the class action settlement between Plaintiffs and Defendant. Pursuant to the Settlement Agreement, ¶ 65, the Settlement Class is defined as:

> All Persons who purchased any Godiva Chocolate Product in the United States during the Class Period. Excluded from the Settlement Class are: (a) Godiva and any of its parents', affiliates', or subsidiaries' employees, officers and directors, (b) distributors, retailers or re-sellers of Godiva Chocolate Products, (c) governmental entities, (d) the Court, the Court's immediate family, Court staff, (e) the mediator and her

staff and immediate family, (f) counsel of
record for the Parties, and their respective law
firms, and (g) all Persons who timely and
properly exclude themselves from the
Settlement Class.

10.     Pursuant to the Preliminary Approval Order, the notice program included

the following components:

- An informational settlement website on which the notices and other important
  Court documents have been posted, and where Class Members can submit claim
  forms and requests for exclusion;
- A toll-free information line where Class Members can call 24/7 for more
  information about the Settlement;
- Direct notice via email;
- Online display banner advertising specifically targeted to reach Class Members;
- Keyword Search targeting Class Members;
- Social media advertising through Facebook and Instagram;
- Notice in a locally distributed newspaper compliant with California's Consumers
  Legal Remedies Act ("CLRA"); and
- Notice pursuant to the Class Action Fairness Act of 2005 ("CAFA") to applicable
  government officials.

11.     These components are discussed in more detail below.

## OFFICIAL SETTLEMENT WEBSITE

12.     On November 9, 2021, Kroll created and is currently hosting the settlement

website www.godivachocolatesettlement.com. All of the aforementioned methods of notice

directed Class Members to this website. The settlement website serves as a landing page for the

banner advertising, where Class Members can get information about the Settlement, including

answers to frequently asked questions, important dates and deadlines, contact information that

includes the address for Kroll and contact information for Plaintiffs' counsel. Relevant documents,

including the First Amended Complaint, the Settlement Agreement, Plaintiffs' Motion for Preliminary Approval, and Long Form Notice were also posted to the website.[4] The settlement website also included a copy of the Exclusion Form and Claim Form for Class Members to submit on the website itself, or print out and physically mail in. As of February 21, 2022, there have been 1,217,265 users to the Settlement Website, with more than 3,019,437 page views.

## TOLL FREE INFORMATION LINE

13.     On October 27, 2021, Kroll established and continues to maintain a 24-hour toll-free Interactive Voice Response ("IVR") telephone line (833.765.2229), where callers may obtain information about the Settlement, including, but not limited to, requesting copies of the Long Form Notice and the Claim Form. As of February 21, 2022, a total of 1,639 callers have contacted the IVR.

## DIRECT EMAIL NOTICE

14.     Direct notice was emailed to all potential Class Members for whom there was a deliverable email address. As part of Kroll's best practice, prior to commencing this notice, Kroll notified the major ISPs (Microsoft, Yahoo, and others) that it was going to begin a large email campaign for this Settlement, thereby reducing the risk of the email being identified as spam or junk email. A sample of the direct email notice is attached as **Exhibit A**.

15.     For each of the email campaigns (the initial notice and reminder notices), Kroll utilized the process of sending the notices out in tranches. This allowed for deploying A and B testing of the notice message, monitoring the expected traffic to the settlement website, sending

---

[4] Kroll will promptly post Plaintiffs' Motion for Final Approval and Fee Application to the settlement website upon the filing of those motions.

and receipt verification of test messages to accounts, and monitoring whether visitors were able to complete the claim form process, on an ongoing basis.

16.    Based upon preliminary Class Member response, and using best notice practices, Kroll along with the parties, optimized the language of the direct email notice to help ensure deliverability (*i.e.*, to help avoid being marked as spam) and remind class members of the pending deadlines. A sample of the revised direct email notice is attached as **Exhibit B**.

17.    After employing a rigorous, detailed analysis of the email records provided by the Defendant, the actual number of valid email addresses was 8,235,538. The initial estimate of 9,660,000 potential valid and deliverable email addresses was reduced after a complete culling of duplicate email records, employing email verification tactics, and identifying email addresses that were unlikely to be associated with potential Class Members.

18.    Kroll began sending the initial email notices on November 15, 2021, and concluded on December 30, 2021. In total, Kroll sent the initial direct email notice to 8,235,538 potential Class Members.

## REMINDER EMAIL NOTICE

19.    Although not required as part of the initial direct email notice plan, the parties directed Kroll to send reminder email notices in order to maximize the reach of the notice to the class and stimulate claims.

20.    On January 20, 2022, Kroll began sending reminder email notices to email addresses that were included in the initial email notice, which were not returned as undeliverable, did not unsubscribe, and had not yet filed a claim. Kroll completed the reminder email notice process on February 5, 2022. With the parties' input, and using best practices, Kroll developed two versions of the reminder notices. A sample of both versions is attached as **Exhibit C**.  In total,

Kroll sent out 7,692,027 email reminders. The reminder email notices generated a 118% increase in the number of claims received during the time period of the reminder email campaign.

## PUBLICATION ELEMENTS – ONLINE DISPLAY AND SOCIAL MEDIA

21.     This campaign employed a programmatic approach[5] across multi-channel and inventory sources including a collection of premium quality partner web properties targeting "*known in-market purchasers and past purchasers of Godiva Chocolate Products.*" Here, the targeting was based on Godiva purchaser transactions.  Over 35 million online display, search, and social media impressions were served across an "allow list[6]" of pre-vetted websites, multiple exchanges, and the social media platforms Facebook and Instagram. The impression delivery of exceeded our planned impressions by 27%, due in part, to active campaign optimizations and Facebook outpacing planned delivery of impressions. Further, keyword search targeting was employed to show advertisements to users in their Google search results. Keyword search terms are a small component of the overall notice plan. For the search term program, there were approximately 54 terms, including, among others: *Godiva, Godiva chocolate, Godiva Settlement, Godiva chocolate class action*, etc.

22.     On Facebook and Instagram, we targeted those who have liked or followed Godiva pages and women who are between the ages of 18 and 54 with a college education or

---

[5] Programmatic refers to computerized media buying of advertising inventory. The mechanics of programmatically serving an online ad are as follows:  A user visits a website and the browser sends a request to the publisher's web server asking for the page's content (*i.e.*, HTML). An invocation code placed on the page loads an external static ad tracker code. The ad tracker makes a request to the ad server querying for an ad markup (also called creative tag) to be loaded into the ad slot. The ad server responds with the ad markup code (before it's returned, the ad server executes all targeting/campaign matching logic). Finally, the publisher's web server returns the information rendering the page's content with specifically targeted ads to that user.

[6] An allow list is a custom list of acceptable websites where ad content may be served. Creating an allow list helps to mitigate ad fraud, ensure ads will be served in relevant digital environments to the target audience, and helps to ensure that ads will not appear next to offensive or objectionable content.

higher.[7] Further, the social media campaign included retargeting, or reminder ads to users who visited the settlement website.

23.        Kroll also targeted over 900,000 followers of Godiva on Facebook and Instagram. These users tend to be highly engaged with the products that they follow.

## CLRA NOTICE

24.        Pursuant to the Settlement Agreement, ¶ 85(d), and compliant with California's CLRA, California Civil Code § 1750, *et seq*., summary notice was published in a California edition of *USA Today* once a week for four weeks on the following dates: November 30, 2021, December 7, 2021, December 14, 2021 and December 21, 2021. Attached as **Exhibit D** are the notices as they appeared in the newspaper.

## CAFA NOTICE

25.        On October 22, 2021, pursuant to the Settlement Agreement, ¶ 85(f), and consistent with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(b), Kroll mailed notice of the proposed settlement under to appropriate state and federal government officials. Attached as **Exhibit E** is a copy of the CAFA notice that was sent. As of February 21, 2022, no government official has directly contacted Kroll regarding the settlement.

## CLAIMS

26.        As of February 21, 2022, Kroll has received a total of 463,495 Claims. Of these, 452,621 are "Option A" Claims which do not require a proof of purchase. A total of 10,874

---

[7] As previously described in my declaration dated October 7, 2021, media research data provided by Simmons-GfK Mediamark Research and Intelligence LLC, reports that over 72% of Purchasers of Godiva Chocolates are between the ages of 18-54 years old, approximately 61% are female and nearly 60% have a household income of $75,000 or higher. Of this target, nearly 94% have gone online in the last 30 days. Additionally, over 87% use social media with approximately 70% reporting that they have visited Facebook in the last 30 days.

"Option B" Claims have been filed which require a proof of purchase.[8]  Once the claim deadline has passed, Kroll will commence review and validation of claims.

## NOTICE PROGRAM RESPONSE

27.     As of February 21, 2022, there have been over 1,217,265 users to the settlement website, with more than 3,019,437 page views. Of the visitors to the website, 38% chose to file a claim.

## REQUESTS FOR EXCLUSION

28.     All notice forms stated that Class Members who wish to exclude themselves from the Settlement must do so by submitting an Exclusion Form to Kroll on or before March 7, 2022, either by U.S. Mail or electronically through the settlement website. An Exclusion Form template was available on the settlement website, but Class Members could submit their own Exclusion Form.

29.     As of February 21, 2022, Kroll has received 12 exclusions. A true and correct list of the individuals who have excluded themselves from the Settlement is attached hereto as **Exhibit F**.

## OBJECTIONS

30.     All notice forms stated that Class Members who wish to object to the Settlement must do so by filing an objection with the Court on or before March 7, 2022.

31.     Even though class members were instructed to file objections with the Court, Kroll would provide the parties with any objections or communications that could be construed as an objection. As of February 21, 2022, Kroll has not received any objections or

---

[8] As stated above, I intend to submit a supplemental declaration that provides updated claim, objection and opt out numbers on or about March 21, 2022, several days before the Final Approval Hearing.

communications that could be construed as an objection.

## NOTICE AND ADMINISTRATION COSTS

32.     As of February 21, 2022, Kroll has invoiced $465,096. Kroll expects to incur additional costs to complete the administration of this matter, but at this time Kroll does not know the precise amount of any additional costs.

## CONCLUSION

33.     In my opinion, the outreach efforts described above reflect a particularly appropriate, highly targeted, and contemporary way to employ notice to this class. Through a multi-media channel approach to notice, which employs direct notice, print, online display, and search and social media, an estimated 82% of targeted Class Members were reached by the media program, on average, 2.8 times.   In my opinion, the efforts to be used in this proposed notice program are of the highest modern communication standards, are reasonably calculated to provide notice, and are consistent with best practicable court-approved notice programs in similar matters and the Federal Judicial Center's guidelines concerning appropriate reach.

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on February 21st, 2022, in Tigard, Oregon.

Jeanne C. Finegan, APR

# Exhibit A

From:       noreply
To:
Subject:    Notice of Settlement Regarding Godiva Chocolate Products

---

Class Member ID: <<refnum>>

**If You Purchased Godiva Chocolate Products,
You May Be Eligible to Receive Up to <u>$25</u> from a Class Action Settlement
Click <u>here</u> to submit a Claim**

The Court has preliminarily approved a proposed settlement in *Hesse, et al. v. Godiva Chocolatier, Inc.,* No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva Chocolatier, Inc. ("Godiva") advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

If you purchased any Godiva Chocolate Product between January 31, 2015 through October 26, 2021 you may be entitled to a cash payment as part of the settlement **up to $25**.

To receive a monetary payment, you must submit a Claim Form by February 23, 2022. Claim Forms can be found <u>here</u> or at www.godivachocolatesettlement.com or can be requested by calling 1-833-765-2229.

If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you properly exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by March 7, 2022 either online at www.godivachocolatesettlement.com or mailed and postmarked to *Hesse, et al. v. Godiva Chocolatier, Inc.* c/o Settlement Administrator PO Box 225391 New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by March 7, 2022. You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this Settlement to determine whether the Court will approve the Settlement, scheduled for March 28, 2022 at 10:00 a.m. in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

This Notice summarizes the Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information, available at www.godivachocoleesettlement.com; by contacting Class Counsel whose contact information can be found at <u>www.faruqilaw.com</u> and <u>www.wandlawfirm.com</u> ; by contacting the Settlement Administrator at 1-833-765-2229 by accessing the Court docket in this case, for a fee, through

the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nysd.uscourts.gov; or by visiting the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

Exhibit B

**If You Purchased Godiva Chocolate Products,
You May Be Eligible For Compensation From A Class Action Settlement
Click here to submit a Claim**

You are receiving this email as a part of a court-authorized legal notice program. Records provided by Godiva Chocolatier, Inc. ("Godiva") indicate that you could be affected by this settlement.

Please read this email as your rights may be affected.

**What is this lawsuit about?**
The Court has preliminarily approved a proposed settlement in *Hesse, et al. v. Godiva Chocolatier, Inc.,* No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

**How do you know if you are included and what do you get?**
You are included in the Settlement if you purchased any Godiva Chocolate Product between January 31, 2015 and October 26, 2021.

You may be entitled to a compensation as part of the settlement. Full compensation details are found at **GodivaChocolateSettlement.com**. You must submit a Claim Form by **February 23, 2022** to be eligible to receive compensation under the settlement.

Submit by Mail: Download the claim form at **GodivaChocolateSettlement.com** or request a claim form by calling **1-833-765-2229**. Hard copy claim forms should be mailed and postmarked to *Hesse, et al. v. Godiva Chocolatier, Inc*. c/o Settlement Administrator, PO Box 225391, New York, NY 10150-5391.

**What are your rights?**
If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you properly exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by **March 7, 2022** either online at **GodivaChocolateSettlement.com** or mailed and postmarked to *Hesse, et al. v. Godiva Chocolatier, Inc.* c/o Settlement Administrator, PO Box 225391, New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this Settlement to determine whether the Court will approve the Settlement, scheduled for March 28, 2022 at 10:00 a.m. in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

The Notice summarized the Settlement.  For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information:

- Visit: GodivaChocolateSettlement.com;
- Contact Settlement Administrator: 1-833-765-2229;
- Contact Class Counsel: www.faruqilaw.com and www.wandlawfirm.com;
- Access the Court docket: Court's Public Access to Court Electronic Records (Pacer)) system, for a fee, at https://ecf.nysd.uscourts.gov; or
- Visit the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

Exhibit C

From:

To:

Subject: Godiva Chocolate Settlement | Reminder to Submit a Claim | Court-Authorized Notice

Class Member ID: <<RefNum>>

**If You Purchased Godiva Chocolate Products,**
**time is running out to submit your claim in this settlement.**
**The deadline to submit is February 23, 2022.**
**Submit Your Claim Online Today**
_____

Records provided by Godiva Chocolatier, Inc. ("Godiva") indicate that you could be affected by this settlement.

**Background.**
The Court has preliminarily approved a proposed settlement in a class action lawsuit alleging that Godiva advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there.

**How do you know if you are included and what do you get?**
This is a reminder, that you are included in the Settlement if you purchased any Godiva Chocolate Product between January 31, 2015 and October 26, 2021 and you may be entitled to compensation as part of the settlement. Full compensation details are found at GodivaChocolateSettlement.com.

**How to File a Claim?**
The easiest, and fastest, way to submit a claim is to submit it online. Submit your Claim Form online at GodivaChocolateSettlement.com or by clicking **here**

The deadline to file a claim is **February 23, 2022**.

You may also download the claim form at GodivaChocolateSettlement.com or request a claim form by calling **1-833-765-2229**.

**What are your rights?**
If you do not want to be bound by the Settlement, you can exclude yourself, but you cannot get a payment, but you preserve the right to sue. The exclusion deadline is **March 7, 2022**.

You can object to the Settlement and provide a written statement explaining why you do not think the Settlement is fair. The Objection deadline is **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

A final approval hearing for this Settlement to determine whether the Court will approve the Settlement, scheduled for March 28, 2022 at 10:00 a.m. in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

For more information concerning the Settlement, your rights, claim forms, how to opt out or object, visit GodivaChocolateSettlement.com.

Unsubscribe from this list. | Do not reply to this email, please see contact information above

From:

To:

Subject: Godiva Chocolate Settlement | Reminder to Submit a Claim | Court-Authorized Notice

---

Class Member ID: <<RefNum>>

**If You Purchased Godiva Chocolate Products,**
**this is your second notice to submit your claim in this settlement.**
**The deadline to submit is February 23, 2022.**
**Submit Your Claim Online Today**
_____

Records provided by Godiva Chocolatier, Inc. ("Godiva") indicate that you could be affected by this settlement.

**Background.**
The Court has preliminarily approved a proposed settlement in a class action lawsuit alleging that Godiva advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there.

**How do you know if you are included and what do you get?**
This is a reminder, that you are included in the Settlement if you purchased any Godiva Chocolate Product between January 31, 2015 and October 26, 2021 and you may be entitled to compensation as part of the settlement. Full compensation details are found at GodivaChocolateSettlement.com.

**How to File a Claim?**
The easiest, and fastest, way to submit a claim is to submit it online. Submit your Claim Form online at GodivaChocolateSettlement.com or by clicking **here**

The deadline to file a claim is **February 23, 2022**.

You may also download the claim form at GodivaChocolateSettlement.com or request a claim form by calling **1-833-765-2229**.

**What are your rights?**
If you do not want to be bound by the Settlement, you can exclude yourself, but you cannot get a payment, but you preserve the right to sue.  The exclusion deadline is **March 7, 2022**.

You can object to the Settlement and provide a written statement explaining why you do not think the Settlement is fair. The Objection deadline is **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

A final approval hearing for this Settlement to determine whether the Court will approve the Settlement, scheduled for March 28, 2022 at 10:00 a.m. in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

For more information concerning the Settlement, your rights, claim forms, how to opt out or object, visit GodivaChocolateSettlement.com.

# Exhibit D

# NATION

## Abortion

Continued from Page 1A

"If the court doesn't overrule Roe in its entirety immediately, it's probably going to do it in a year or two," said Mary Ziegler, a Florida State University law professor. "Whether it happens now or later, I think it's going to happen."

A 7-2 majority in Roe v. Wade established a constitutional right to abortion and allowed people to exercise that right until the end of the second trimester. A subsequent decision in 1992 ended the trimester framework and ruled people could obtain an abortion until viability, the point when a fetus can survive outside the womb or about 24 weeks into a pregnancy. The Mississippi law is in direct conflict with the viability standard.

Arguing in support of the law, Mississippi explicitly asked the Supreme Court to overturn Roe, calling it "dangerously corrosive to our constitutional system." That is a more aggressive position than the state took when it first brought the case to the high court early last year.

For years, the legal battle over abortion has focused on regulating the procedure, such as requirements that minors inform their parents before ending a pregnancy or requiring doctors performing the procedure to have privileges at nearby hospitals. For antiabortion groups, the Dobbs case is the first opportunity in a long time to focus squarely on whether the procedure itself is constitutional.

"The ultimate victory – what we're hoping for and what the Mississippi attorney general's office has asked – is for an all-out overturning of Roe and a return of this issue to the states," said Mallory Quigley with the anti-abortion group Susan B. Anthony List. "It's clear the legislative branch of government at the state level is ready to debate."

### The clinic

The scene outside the Pink House was relatively subdued. Hancock and other escorts ushered women through the doors. A few feet away, a group of young women quietly set their index fingers to Bible verses. A handful of men shouted above a clash of gospel and pop music.

One man's voice cut through the swell of sound: "Turn away from murdering your baby boy or girl."

A clinic escort shot back sarcastically, calling him by name, "Yeah, that's what preaching looks like, Daniel."

Jackson Women's Health Organization, the state's only clinic for 15 years, normally sees about 3,000 patients annually, said its director, Shannon Brewer. The staff saw an uptick in patients when the Supreme Court temporarily allowed Texas' ban on abortions after six weeks of pregnancy to stand. It's about a six-hour drive from Dallas to Jackson.

"Most of these are Black women, most are disproportionately poor here in Mississippi," Brewer said of her patients. "People with the means to be able to travel and get an abortion in other states, this is not going to affect them. It is going to affect the poor, and it's just going to push them further and further into poverty."

Along with the high poverty rate, Mississippi hosts the nation's second-highest teen birthrate.

State education officials "approved curricula only once in the past 10 years. And that was 10 years ago," said Josh McCawley, deputy director of Teen Health Mississippi, a group that advocates for better sex education and health care for young people. The public school curricula – which focuses on abstinence – prohibits teachers from giving physical demonstrations of condom use or other contraceptives.

"They're not really covering a lot of issues that are prevalent today, issues such as consent, relationship violence and human trafficking," McCawley said.

About 29 in 1,000 Mississippi teens ages 15 to 19 will give birth, according to the Centers for Disease Control and Prevention, the second-highest rate in the nation behind Arkansas. The national average is about 17.4 in 1,000, CDC data shows.

### The court

Nine justices will file into the courtroom Wednesday to hear arguments over Mississippi's abortion law. Much of the focus will rest on three: Chief Justice John Roberts, Associate Justice Brett Kavanaugh and Associate Justice Amy Coney Barrett.

Kavanaugh and Roberts may be caught between their views on abortion and a concern about the potential impact on the court of overturning one of its most widely recognized precedents. In written arguments, attorneys for the clinic have leaned heavily into the notion that overturning Roe would damage the court's reputation.

It's not clear how Barrett, the newest member of the court, will vote.

Neal Devins, a law professor at William & Mary Law School, said a lot rides on questions such as "how strongly Justice Kavanaugh opposes Roe."

"It may be that the center of the court doesn't yet know its mind 100%. It may be that the center of the court wants to see what happens afterward, so it can better make up its mind," Devins speculated.

In that scenario, a majority might uphold the Mississippi law but stop short of overruling Roe. That would throw the legal fight back to lower courts to figure out where to draw new lines between the right to abortion and a state's efforts to regulate or limit it.

"My best guess is that they'll kick the can," Devins said. "To not issue a definitive ruling and allow things to play out doesn't come at a great cost."

Though the Supreme Court often looks for a middle ground in complicated controversies, particularly under Roberts, one of the challenges of the Mississippi law is that the middle ground is exceedingly narrow. Upholding the law would probably mean overruling the viability threshold.

"A decision upholding this ban is tantamount to overruling Roe," said Julie Rikelman, the senior director of litigation at the Center for Reproductive Rights, who will argue the case at the high court Wednesday on behalf of the clinic.

Quigley said the anti-abortion movement doesn't share that perspective: Upholding the Mississippi ban while not nullifying the constitutional right to abortion would be a victory, she said, even if it doesn't result in a complete overruling of Roe right now.

"We see victory as being on a sliding scale," she said.

Polls show Americans are divided. Nearly two-thirds say the Supreme Court should uphold Roe, according to a Washington Post-ABC News poll. A Marquette Law School poll found 37% of Americans favor banning abortions after 15 weeks compared with 32% who would oppose that move.

Jackson Women's Health Organization does not perform abortions after 16 weeks. That may be another issue that comes up during arguments. In its ruling in Planned Parenthood v. Casey in 1992, the court said states could not pass laws that create an "undue burden" on the right of people to access an abortion.

The court may look to tinker with that standard, applying it more broadly than to questions over parental consent laws and deciding that the one-week difference between the law's cut-off and when the clinic chooses not to conduct the procedure isn't an undue burden.

Mississippi approved its prohibition in 2018, making it one of 18 states with pre-viability bans blocked by federal courts, according to the Guttmacher Institute, a research group that supports abortion rights. The law has no exception for rape or incest but allows abortions for medical emergencies and "severe fetal abnormality."

An appeals court in New Orleans, citing the high court's decisions in Roe and Casey, concluded the law was unconstitutional in 2019.

The Supreme Court is likely to rule in the case in June.

### The protests

Shouting has become a regular sound outside the clinic. But Sydney Bowles, 18, has been coming here two days a week not to make noise but to pray.

A member of a Christian ballet school, Bowles and her friends sometimes hug each other when a car pulls out of the parking lot. Sometimes they approach car windows with their Bibles resting in the crook of an arm.

Bowles said she grappled with her thoughts on abortion a few years ago. Is it wrong? Should people have a choice to terminate a pregnancy? What about when a pregnancy results from rape or incest? She and the other women take part in what they call a "peaceful and loving" stance against the procedure.

"We can't control what they do," Bowles said of the more raucous protesters. "We're just hoping that the worship and the prayers will be heard instead."

## Atlantic hurricane season ends quietly after busy start

Doyle Rice
USA TODAY

The intense 2021 Atlantic hurricane season comes to its official end Tuesday, a season that saw 21 named tropical storms and hurricanes.

This was the third-most for any hurricane season, behind only 2020's record 30 storms and the 28 storms that formed in 2005. A typical season sees 14 storms. And for the second year in a row, the entire list of names for the season was used up, from Tropical Storm Ana in May to Tropical Storm Wanda in November.

It also was a record sixth consecutive year of above-normal activity.

But despite the high number of storms, 2021's hurricane tally of seven was right in line with the average over the past 30 years, said Weather.com meteorologist Jonathan Erdman. It was only half of the nearly record-breaking 2020 total of 14 hurricanes, he said. A tropical storm becomes a hurricane when its sustained wind speed reaches 74 mph.

Eight of those storms made landfall in the USA in 2021, beginning with Claudette, named just after its center moved ashore in Louisiana in late June, Erdman said.

Colorado State University hurricane researcher Phil Klotzbach told USA TODAY that "obviously, 2021 will be most remembered for Hurricane Ida, which caused both devastation to the central Gulf Coast as well as torrential rain to the mid-Atlantic states."

Ida smashed into the Louisiana coast with 150 mph winds on Aug. 29, the 16th anniversary of Hurricane Katrina's devastating landfall.

After battering the South and despite being downgraded to a tropical depression, Ida continued on a path toward the mid-Atlantic and Northeast over the next few days, where heavy rains caused catastrophic flooding. At least 53 people died from drowning, according to the Centers for Disease Control and Prevention.



Fran Tribe and her dog Dave sit outside home destroyed by Hurricane Ida in Houma, La.. in August.
SCOTT CLAUSE/USA TODAY NETWORK

In all, Ida killed 91 people in the U.S., according to the CDC. NOAA estimated Ida inflicted just under $65 billion in damage. That's the fifth-costliest tropical cyclone in U.S. history behind only Katrina, Harvey, Maria and Sandy, Erdman said.

Klotzbach said "Ida serves as a great reminder that hurricanes aren't just a coastal problem."

Other notable storms included Hurricane Henri, which became the first named storm to make landfall in Rhode Island since Hurricane Bob in 1991. (Henri was a tropical storm at landfall.) And Hurricane Nicholas was the first hurricane to make landfall in Texas in September since Ike in 2008, Klotzbach said. Nicolas brought flooding from storm surge and heavy rain into the storm-weary northern Gulf Coast.

In addition, coastal and inland damage from Hurricane Elsa and Tropical Storm Fred vaulted them into billion-dollar storms, according to NOAA, joining Hurricanes Ida and Nicholas, Erdman said.

Though the 2021 season ended above normal, the biggest surprise probably was the quiet end to the season, especially in the Caribbean, Klotzbach told USA TODAY. The Atlantic had no named storm activity from Oct. 3 to Oct. 30 – the first time since 2006 that the Atlantic had no such activity in that period.

**LEGAL NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

## IF YOU PURCHASED GODIVA CHOCOLATE PRODUCTS

**You May Be Eligible to Receive Up to $25 from a Class Action Settlement by visiting GodivaChocolateSettlement.com**

The Court has preliminarily approved a proposed settlement in *Hesse, et. al. v. Godiva Chocolatier, Inc.*, No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva Chocolatier, Inc. ("Godiva") advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

If you purchased any Godiva Chocolate Product between **January 31, 2015** through **October 26, 2021**, you may be entitled to a cash payment up to $25 as part of the settlement.

To receive a monetary payment, you must submit a Claim Form by **February 23, 2022.** Claim Forms can be found at **GodivaChocolateSettlement.com** or can be requested by calling **1-833-765-2229**.

If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by **March 7, 2022**, either online at **GodivaChocolateSettlement.com** or mailed and postmarked to Hesse v. Godiva Chocolatier, PO Box 225391, New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by **March 7, 2022.** You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this settlement to determine whether the Court will approve of the settlement, scheduled for **March 28, 2022 at 10:00 a.m. Eastern** in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

This Notice summarizes the Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information, available at **GodivaChocolateSettlement.com**, by contacting Class Counsel whose contact information can be found at **GodivaChocolateSettlement.com**, by contacting the Settlement Administrator at **1-833-765-2229**; by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nysd.uscourts.gov; or by visiting the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

**GodivaChocolateSettlement.com**
**833-765-2229**

## ASK HUMAN RESOURCES

# Remote location may affect pay

### Local cost of living used as a factor for decades



**Johnny C. Taylor Jr.**
Columnist
USA TODAY

*Johnny C. Taylor Jr. tackles your human resources questions as part of a series for USA TODAY. Taylor is president and CEO of the Society for Human Resource Management, the world's largest HR professional society and author of "Reset: A Leader's Guide to Work in an Age of Upheaval."*

*The questions are submitted by readers, and Taylor's answers below have been edited for length and clarity.*

**Question: I work as a therapist for a mental health service agency. We recently switched from 50% remote to 100% remote work. With the ability to work from anywhere, I am planning on moving from New York City to Jacksonville, Florida. With our shift to remote, our location is calculated into our pay ranges. Is this common practice or a new phenomenon? Why does location impact my pay? – Nikki**

*Johnny C. Taylor Jr.:* Yes, factoring in location when determining an employee's base salary is becoming common practice.

Frankly, employers have done this for decades. The growth of remote work is making more people aware of a location's role in devising compensation. Whether it is the regional labor market or local cost of living, where you live has always been calculated into your pay rate. Pay rates are generally designed to be sufficient for attracting workers in a local market. However, in today's global economy, companies constantly adjust their pay structures to account for the local cost of living and local wages for similar jobs.

The proliferation of remote and hybrid work has created opportunities for



Whether it is the regional labor market or local cost of living, where you live has always been calculated into your pay rate. GETTY IMAGES

employers and employees to reshape what it means for their careers and lifestyles. You're among a growing number of people with the ability to work 100% remotely.

Remote workers now have the power to work from anywhere in the world. Conversely, employers also have the opportunity to recruit talent from anywhere. In a global labor market, you are no longer competing with workers in New York City or Jacksonville; you are competing with workers virtually everywhere.

The cost of living in Jacksonville is about half that of New York City. When you take this disparity into account, the significance of location becomes clear. Hopefully, this helps you understand your employer's perspective a bit better. Best of luck on your move.

**Q: I just started a new job, and it offers HSA and FSA benefits. I am single with no dependents and relatively healthy. Should I consider either one of these options? What are the major differences between them? – Violet**

*Taylor* Congratulations on your new

> Remote workers now have the power to work from anywhere in the world. Conversely, employers also have the opportunity to recruit talent from anywhere.

job. There certainly are important differences between Health Savings Account and Flexible Spending Account benefits. Even if you don't expect a significant number of medical expenses, there may still be advantages of each you'll want to at least consider.

HSAs and FSAs are both designed to cover potential future medical expenses. Given that they are funded from pretax dollars, they both reduce your tax liability, which essentially saves you money when used properly. They primarily differ in how long each benefit is

available for use, who qualifies for the benefit and how much is available to use.

**How long is the benefit available for use?** You own and control your HSA and are allowed to roll over your contributions year after year. Should you leave your current job, you can also take your HSA with you. FSAs are less flexible as they are employer-owned. FSA funds not used in the current year generally cannot be carried over into the following year. So, you can potentially lose the money you contributed to the account. However, if an employer's plan allows for carryover, an employee may have the option to carry over a limited portion of the FSA funds.

**Who qualifies for the benefit?** HSAs are only compatible with high-deductible health care plans. While more affordable, the deductibles you pay when using the plan are considerably higher than traditional health care plans. HSAs can be a great choice for young, healthy employees with no dependents. FSAs are compatible with either traditional health care plans or high-deductible health care plans.

**How much is available?** Maximum contribution amounts also vary between FSAs and HSAs. The IRS can adjust those amounts year to year. For 2022:

● FSAs have a $2,850 limit for individuals.

● HSAs have a $3,650 limit for self-only coverage and a $7,300 limit for family coverage.

In addition, an HSA can also double as a retirement savings vehicle. Both employer and employee contributions may continue to grow in savings with the option to also invest savings in the stock market to generate additional income.

At the end of the day, every employer selects benefit offerings to meet its specific circumstances. Your HR professional is your best resource as you sort through the unique details of your employer's benefit options. I hope these considerations shed some light on your options and help you make the choice best suited for your lifestyle.

LEGAL NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

## IF YOU PURCHASED GODIVA CHOCOLATE PRODUCTS

### You May Be Eligible to Receive Up to $25 from a Class Action Settlement by visiting GodivaChocolateSettlement.com

The Court has preliminarily approved a proposed settlement in *Hesse, et al. v. Godiva Chocolatier, Inc.*, No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva Chocolatier, Inc. ("Godiva") advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

If you purchased any Godiva Chocolate Product between **January 31, 2015** through **October 26, 2021**, you may be entitled to a cash payment up to $25 as part of the settlement.

To receive a monetary payment, you must submit a Claim Form by **February 23, 2022**. Claim Forms can be found at **GodivaChocolateSettlement.com** or can be requested by calling **1-833-765-2229**.

If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by **March 7, 2022**, either online at **GodivaChocolateSettlement.com** or mailed and postmarked to Hesse v. Godiva Chocolate Box 225391, New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this settlement to determine whether the Court will approve of the settlement, scheduled for **March 28, 2022 at 10:00 a.m. Eastern** in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

This Notice summarizes the Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information, available at **GodivaChocolateSettlement.com**; by contacting Class Counsel whose contact information can be found at **GodivaChocolateSettlement.com**; by contacting the Settlement Administrator at **1-833-765-2229**; by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nysd.uscourts.gov; or by visiting the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

**GodivaChocolateSettlement.com
833-765-2229**



USA TODAY CROSSWORD

9 LETTER WORD FOR AVOIDING INTIMACY

Download on the App Store
GET IT ON Google Play
USA TODAY

## NATION

# Supreme Court declines challenge from Wis. writers

### Conservative think tank banned from press event

**John Fritze**
USA TODAY

WASHINGTON – The Supreme Court declined Monday to decide whether Wisconsin's governor violated the First Amendment when he barred a conservative think tank from attending news conferences in a case that raised questions about media freedom and the type of organizations that should be considered news outlets.



Wisconsin Gov. Tony Evers is selective about whom he invites to news conferences. STEVE APPS/AP

The Madison-based John K. MacIver Institute for Public Policy, a self-described think tank that "promotes limited government" sued Wisconsin Gov. Tony Evers in 2019 after the Democrat declined to invite its writers to attend a briefing about the state budget. Evers' office asserted that MacIver is "not principally a news organization."

MacIver's appeal arrived at the Supreme Court as other government entities have wrestled with how to define a reporter when the internet often blurs the line and advocacy journalism has proliferated in state capitals and Washington.

"The First Amendment exists to protect the rights of the people, not the convenience of the politicians," the institute told the Supreme Court in its appeal. "When in doubt, this court should prefer the rights of journalists to question elected officials."

MacIver asserted that the First Amendment's press clause requires government officials to restrict access to news briefings only in limited circumstances: when the restriction serves a compelling state interest that is addressed in the narrowest possible way. Evers' aides, the group argued in court papers, did not meet that high standard.

Ruling against the group, a panel of the Chicago-based U.S. Court of Appeals for the 7th Circuit looked at the case through a different lens, deciding that the governor's office did not create a "public forum" by inviting "a limited number of journalists to its press conferences." The panel wrote that other news outlets widely considered to be conservative were invited to the state budget briefings.

MacIver describes itself on its website as a "Wisconsin-based think tank that promotes free markets, individual freedom, personal responsibility and limited government."

The appeal implicated a different section of the Constitution than what was raised in 2018 when the White House, under President Donald Trump, pulled credentials from CNN reporter Jim Acosta. A federal district judge in that case said the White House violated the reporter's Fifth Amendment right to due process.

MacIver argued in court papers that it should be treated like other media outlets because it routinely covers legislative meetings and other events in the state Capitol. MacIver's writers have attended some of Evers' news conferences but have been kept in the dark about others and were left out of budget briefings.

*Contributing: Milwaukee Journal Sentinel*

# Meadows email: National Guard would 'protect pro Trump people' on Jan. 6

### Committee set to vote on contempt citation

**Rick Rouan**
USA TODAY

White House chief of staff Mark Meadows sent a message of reassurance the day before a riot at the Capitol about the protection the National Guard would offer some individuals Jan. 6.



Former White House chief of staff Mark Meadows, with his wife, Debbie, had cooperated with the panel investigating the Jan. 6 insurrection. ALEX WONG/GETTY IMAGES

Meadows wrote in an email that the National Guard would "protect pro Trump people," according to the House committee investigating the insurrection, and others would be available on standby.

The message was among the documents Meadows shared with the committee that plans to recommend a contempt citation for the top adviser to President Donald Trump.

It was part of a trove of new information contained in a 51-page report the committee released Sunday as it prepared to vote on the contempt citation, which would go to the full House. The House would vote on whether to refer Meadows to the Justice Department for prosecution.

Meadows initially cooperated with the committee, providing documents for its investigation. But last week, his attorney said he would not sit for a deposition, citing Trump's claim of executive privilege.

The committee's investigators wrote in the report that they would have asked Meadows about deployment of the National Guard had he sat for the deposition. The report cited the Jan. 5 email in which Meadows wrote that "pro Trump people" would be protected.

The report doesn't identify the recipient of the message or detail why protection would be needed. Meadows sent the message the day before Trump spoke at a rally near the Capitol as lawmakers began counting the electoral votes confirming that Joe Biden defeated Trump in the presidential election in November.

"Mr. Meadows apparently knows if and when Mr. Trump was engaged in discussions regarding the National Guard's response to the Capitol riot, a point that is contested but about which Mr. Meadows provided documents to the Select Committee and spoke publicly on national television after President Trump left office," the report said.

Other revelations in the report include:

● Meadows' text message exchange with the organizer of the rally Jan. 6 on the Ellipse, where the organizer said "things have gotten crazy and I desperately need some direction. Please."

● His receipt of text messages and emails about efforts to get state lawmakers in Republican states to send alternate slates of electors to Congress to overturn the election. When one member of Congress pointed out the plan was "highly controversial," Meadows responded, "I love it."

**LEGAL NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

## IF YOU PURCHASED GODIVA CHOCOLATE PRODUCTS

**You May Be Eligible to Receive Up to $25 from a Class Action Settlement by visiting GodivaChocolateSettlement.com**

The Court has preliminarily approved a proposed settlement in *Hesse, et al. v. Godiva Chocolatier, Inc.*, No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva Chocolatier, Inc. ("Godiva") advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

If you purchased any Godiva Chocolate Product between **January 31, 2015** through **October 26, 2021**, you may be entitled to a cash payment up to $25 as part of the settlement.

To receive a monetary payment, you must submit a Claim Form by **February 23, 2022**. Claim Forms can be found at **GodivaChocolateSettlement.com** or can be requested by calling **1-833-765-2229**.

If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by **March 7, 2022**, either online at **GodivaChocolateSettlement.com** or mailed and postmarked to Hesse v. Godiva Chocolatier, PO Box 225391, New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this settlement to determine whether the Court will approve of the settlement, scheduled for **March 28, 2022 at 10:00 a.m. Eastern** in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

This Notice summarizes the Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information, available at **GodivaChocolateSettlement.com**; by contacting Class Counsel whose contact information can be found at **GodivaChocolateSettlement.com**; by contacting the Settlement Administrator at **1-833-765-2229**; by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nysd.uscourts.gov; or by visiting the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

**GodivaChocolateSettlement.com
833-765-2229**



USA TODAY CROSSWORD

9 LETTER WORD FOR AVOIDING INTIMACY

Download on the App Store

GET IT ON Google Play

USA TODAY

# Las Vegas

Continued from Page 1D

sorts World hotel and casino that arrived in June at the north end of the Strip, originally fell to Dion, who was tapped for a monumental return to the city in November.

But in October, the grand dame of residencies announced that "severe and persistent" muscle spasms were preventing her from rehearsing. Her spate of dates in November, January and February currently are shelved.

Bobby Reynolds, senior vice president of AEG Presents Las Vegas, which books the Resorts World Theatre, said the need to replace those vacant dates was less of a concern than establishing the venue's reputation with a relevant act.

"I was not interested in filling in a weekend in January because Celine had canceled. We're super mindful of that theater and the reputation we want to build there," he said. "We don't want to sacrifice anything and we don't want to negotiate on the caliber of talent."

Underwood's lavish production – which Reynolds says is "such a beautiful show that that doesn't exist on the road and couldn't exist on the road" – includes dates in March, April and May. As she wraps her inaugural run, Katy Perry is warming up the debut of "Play," which will debut Dec. 29 with dates through March 19.

The venue also has tapped Luke Bryan for his first residency, arriving in February, and, in a "limited run" of six dates in April, Michael Bublé.

For several months, Resorts World was the rumored landing spot for Adele, who will reportedly earn more than $2 million per show at her Caesars Palace domain, with each appearance generating about $600,000 per show gross, according to Billboard. In contrast, Dion averaged $654,000 for "Celine" (2011-2019); Elton John's 2004-2009 "Red Piano" spectacle was $673,000; and Spears' "Piece of Me" at Planet Hollywood (2013-2017) was $555,000, according to Billboard.

Meglen confirmed the Adele talks with Resorts World, but ultimately, "We really didn't have the time. We were booked. She's only doing Fridays and Saturdays, so if I'm the property, what are they doing Sunday through Thurs-



Lady Gaga has been performing two residencies at the Dolby Live at Park MGM – a full pop production and her "Jazz and Piano" show. PROVIDED BY KEVIN MAZUR

day? Now you're going to other artists and saying, 'You can't have the weekends.' It's printing money, so it's a matter of how much are you going to print and how are you going to do it?"

As everyone from John Fogerty (February and March at Wynn) to John Legend (launching at Planet Hollywood in April) eyes a temporary base camp in Las Vegas – affording them the luxuries embedded in high-end resorts and negating the need for grueling travel – the model remains an ideal arrangement for artists and fans.

"We're selling more (tickets) now than in 2019 on a nightly basis," said Amanda Moore-Saunders, senior vice president Las Vegas Residencies for Live Nation, which books shows at The Colosseum, Dolby Live at Park MGM and at Zappos Theater at Planet Hollywood Resort & Casino, among other venues. "The appetite is voracious. This is a market that sells 2 million tickets a week. People want to come to Vegas to have a good time."

Added Scott Sibella, president of Resorts World, "Vegas has shifted in the last 10 years and that shift is more than just coming to Vegas to gamble. We're known for the best food in the world, the

best retail and the best entertainment. It's not just slot machines and blackjack."

## So what is a residency?

What differentiates a residency from a limited engagement? Is it a distinctive production or merely a detour from a larger tour for a series of dates?

Some of it is industry jargon, but there is "a fine line" between a residency and a limited engagement, said Moore-Saunders, who applies the limited engagement tag to performances in the three-to-nine show range.

The Doobie Brothers recently announced an eight-date run in May at Zappos Theater at Planet Hollywood.

Styx is a frequent visitor at The Venetian Theatre, popping in for a handful of shows a couple of times a year (they return for five concerts in January and February with Nancy Wilson of Heart).

Brad Paisley will play two intimate acoustic dates at the Encore Theater at Wynn, which seats about 1,500, in March.

"We let the artist decide what they want to do," Moore-Saunders said. "What's important is that we impress on

fans that it's only something they're going to see in Vegas. You might see Keith Urban do three shows at a time, but it's over three years and he's coming back to the same venue. It is a show that is unique that is specific to that room.'"

### Artists can decide the right fit

Installing the appropriate artist in the appropriate venue also is part of the process when cultivating residencies.

While megastars such as Underwood, Dion, Lady Gaga, Sting and Bruno Mars opt for the spaciousness of Resorts World, Dolby Live at Park MGM, Zappos Theater and The Colosseum – which experienced a significant refresh in 2019 – others deliberately seek an undersized venue to present fans with a special encounter.

In 2009, Garth Brooks opened a three-year, one-man show at Wynn's Encore Theatre (he'll be back in February for two nights of a similarly stripped presentation at Dolby Live). One of music's most ferocious live performers who routinely packs stadiums sought to offer diehards simple, unvarnished takes on his music as well as influential covers.

"This is the kind of room that gives you the feel of old Las Vegas, that you could see the fans," said Brian Gullbrants, president of Wynn Las Vegas.

"Lionel (Richie, who returns in January) was great, interacting with fans and letting them ask questions of him. Garth had many a night when he would take requests and do a Q&A. He's an amazing storyteller and it was a lot like the old 'MTV Unplugged.' There's not a lot of places you could have his stardom and fame and still allow for such interaction with fans."

As Las Vegas continues its pandemic-era rebound and international travel – an important sector with artists such as Adele and Dion – inches back, there is a seemingly unlimited market for artists to stake their turf, regardless of the longevity of their campaigns.

Kurt Melien, president of Live Nation Las Vegas, is especially optimistic with ambitions on Vegas dominating the landscape.

"Now it's, 'How do we become bigger than any city in the world as the capital of live music?' It's already the residency capital, so the idea now is we're the live music capital," he said. "It used to be Cirque and Celine and it's so much more than those now."

# Journal

Continued from Page 1D

tery.

"The day Charles died was the hardest day of my life. The second hardest was his funeral, and that was the third hardest day of my life," she says. "However, I'm glad I was there. It just reminded me that even though things are painful, it doesn't mean you shouldn't do them."

Faith guided the creators during filming. Washington had prayer circles on the set and often called on the spirit of the fallen soldier.

"I woke up every morning wanting to please Charles, saying, 'C'mon Charles, be with us today,' and 'What do you want me to do?' " Washington says, adding a hearty laugh, "And some days he'd say, 'Get out the way, leave that boy alone.' "

For the leading man, who has traversed through Hollywood with Marvel's "Black Panther" and earned the title of People's Sexiest Man in 2020, "Journal" marks his first romantic debut.

"When I was younger, I didn't think I was old enough. I didn't think I had enough life experience to really bring to a role like this. Charles was a grown man. Everything just kind of came to fruition where I'm at in my life right now personally (and) professionally," says Jordan, 34, who took his relationship with Lori Harvey public early this year.

Though Jordan acknowledges having natural chemistry with Adams, whose star has been on the rise with roles in "The Photograph" and "Roxanne Roxanne," he says starring in a love story is "almost like an arranged marriage," though Adams was "down to earth" and a "goofball."

Jordan chooses his words carefully to describe filming the movie's love scenes, but with intimacy coordinators and a closed set, he says, "It's not what you think."

The tenderly shot scenes include a prime view of Jordan's behind.

"I knew that I wanted a woman to shoot the film," Washington says, "because I wanted that perspective" for the story of the relationship. He asked cinematographer Maryse Alberti where she would put the camera as the characters made love.

"She's like, 'Michael B. Jordan's



Dana and Charles with their young son, Jordan. PROVIDED BY A JOURNAL FOR JORDAN

butt,' " Washington says through chuckles. "I'm like 'Well, I didn't think of that.' "

As Washington sees it, "there is no simple answer" when it comes to creating lasting relationships.

"But love never dies," he says of the movie. And of his own love story with wife Pauletta: "We're still here getting stronger. But we're also just moving out of the way and letting our youth, our children and this next generation (take) their turn."

Jordan Canedy is part of that upand-coming generation, and he's finding new moments in life to connect with his father. At the New York premiere of the film, Canedy's 15-year-old son showed off his shoes to the film's star and director. "I say 'What's up with your shoes?' " Jordan says. "And he's like, 'These are my dad's shoes.' Literally grew into his father's shoes."

The film's release coincides with Christmas Day celebrations, though Jordan says his "unconventional" holiday will be spent with his "extended work family" while he films "Creed III," which will be his directorial debut.

Washington, who stars opposite Frances McDormand in Joel Coen's "Tragedy of Macbeth" (also out Christmas Day in select theaters), says he's learned from the masters in directing and knows Jordan can take on the challenge: "You learn from the best, and you steal from the best, and you share what you learn."

What Adams learned from Washington's direction was that "we weren't making a documentary about Dana," with whom Adams plans to celebrate Christmas Day.

"This was a biopic about the love that Dana and Charles shared," Adams says.

LEGAL NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

# IF YOU PURCHASED GODIVA CHOCOLATE PRODUCTS

## You May Be Eligible to Receive Up to $25 from a Class Action Settlement by visiting GodivaChocolateSettlement.com

The Court has preliminarily approved a proposed settlement in *Hesse, et. al. v. Godiva Chocolatier, Inc.*, No. 1:19-cv-00927-AJN, a class action lawsuit alleging that Godiva Chocolatier, Inc. ("Godiva") advertised its chocolate products as being made in Belgium when they are not exclusively manufactured there. Godiva denies the allegations. The Court has not determined which side is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties, expenses and expenditure of resources associated with ongoing litigation.

If you purchased any Godiva Chocolate Product between **January 31, 2015** through **October 26, 2021**, you may be entitled to a cash payment up to $25 as part of the settlement.

To receive a monetary payment, you must submit a Claim Form by **February 23, 2022.** Claim Forms can be found at **GodivaChocolateSettlement.com** or can be requested by calling **1-833-765-2229**.

If you do not want to be bound by the Settlement, you must submit a written Request for Exclusion. If you exclude yourself, you cannot get a payment, but you preserve the right to sue Godiva for the claims alleged in the lawsuit. Any Request for Exclusion must be submitted by **March 7, 2022**, either online at **GodivaChocolateSettlement.com** or mailed and postmarked to Hesse v. Godiva Chocolatier, PO Box 225391, New York, NY 10150-5391.

You can also object to the Settlement. An objection is a written statement explaining why you do not think the Settlement is fair. Any objection must be submitted to the Court by **March 7, 2022**. You cannot object if you exclude yourself from the Settlement.

There will be a final approval hearing for this settlement to determine whether the Court will approve of the settlement, scheduled for **March 28, 2022 at 10:00 a.m. Eastern** in the Thurgood Marshall Courthouse, Courtroom 906, located at 40 Foley Square, New York, NY 10007.

This Notice summarizes the Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement, and other documents and information, available at **GodivaChocolateSettlement.com**; by contacting Class Counsel whose contact information can be found at **GodivaChocolateSettlement.com**; by contacting the Settlement Administrator at **1-833-765-2229**; by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.nysd.uscourts.gov; or by visiting the office of the Clerk of the Court for the United States District Court for the Southern District of New York, located at 40 Foley Square, New York, NY 10007.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS

## GodivaChocolateSettlement.com
## 833-765-2229

Exhibit E



1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711

+1.212.262.6900
+1.212.977.1649
PerkinsCoie.com

October 22, 2021

Dennis C. Hopkins
DHopkins@perkinscoie.com
D.  +1.212.262.6916
F.  +1.212.977.1646

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

To:   Federal and State Officials Per 28 U.S.C. § 1715
      (*See* attached distribution list)

Re:   **CAFA Notice for the Proposed Settlement in *Hesse, et al. v. Godiva Chocolatier*, Inc.,**
      **No. 1:19-cv-00972-AJN in the United States District Court for the Southern District**
      **of New York**

To Whom It May Concern:

Pursuant to Section 3 of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, Defendant
Godiva Chocolatier, Inc. ("Defendant" or "Godiva") hereby notifies you of the proposed
settlement of the above-captioned action (the "Action") currently pending in the United States
District Court for the Southern District of New York (the "Court").

28 U.S.C. § 1715(b) lists eight items that must be provided to you in connection with any proposed
class action settlement. Each of these items is addressed below:

1.   28 U.S.C. § 1715 (b)(l) -  a copy of the complaint and any materials filed with  the
     complaint and any amended complaints.

     The Class Action Complaint, and First Amended Class Action Complaint are
     available at the website: www.cafanotice.com under the *Hesse v Godiva* folder as
     **Exhibits A, and B**, respectively.

2.   28 U.S.C. § 1715 (b)(2) - notice of any scheduled judicial hearing in the class
     action.

     On October 13, 2021, Plaintiff filed a motion for preliminary approval of the class
     action. The Court has not scheduled a hearing at this time.

3.   28 U.S.C. § 1715(b)(3) - any proposed or final notification to Class Members.

     A copy of the proposed Summary Notice, and Long-Form Notice of Settlement,
     that will be provided to Class Members and will be available on the website created
     for the administration of this matter. The Notices are provided in electronic form at

October 22, 2021
Page 2

the website: www.cafanotice.com under the *Hesse v Godiva* folder as **Exhibit D and D1**, respectively. The Notices describe, among other things, claim submission and the Class Members' rights to object or exclude themselves from the Class.

4. <u>28 U.S.C. § 1715(b)(4) - any proposed or final class action settlement.</u>

The Settlement Agreement is provided in electronic form on the website: www.cafanotice.com under the *Hesse v Godiva* folder as **Exhibit E**.

5. <u>28 U.S.C. § 1715(b)(5) - any settlement or other agreement contemporaneously made between class counsel and counsel for defendants.</u>

There are no other settlements or other agreements between Class Counsel and counsel for Defendants beyond what is set forth in the Agreement.

6. <u>28 U.S.C. § 1715(b)(6) - any final judgment or notice of dismissal.</u>

The Court has not yet entered a final judgment or notice of dismissal. Accordingly, no such document is presently available.

7. <u>28 U.S.C. § 1715(b)(7) – (A) If feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or (B) if the provision of the information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement.</u>

The class is defined as All Persons who purchased any Godiva Chocolate Product in the United States during the Class Period. Excluded from the Settlement Class are: (a) Godiva and any of its parents', affiliates', or subsidiaries' employees, officers and directors; (b) distributors, retailers or re-sellers of Godiva Chocolate Products; (c) governmental entities; (d) the Court, the Court's immediate family and Court staff; (e) the mediator and her staff and immediate family; (f) counsel of record for the Parties, and their respective law firms; and (g) all Persons who timely and properly exclude themselves from the Settlement Class.

Godiva currently does not know or have a means of reasonably determining how many Settlement Class Members reside in each state or the name of each such class member during the class period. Consequently, at this time, Godiva estimates of the number of class members residing in each state must necessarily take the form of an estimate of the proportion of class members who are in each state. Godiva believes it is probable that the proportion of class members in each state, and the

October 22, 2021
Page 3

benefits they will receive, is roughly the same as that state's share of the overall population of the 50 states (and District of Columbia) covered by the Settlement.

8.  <u>28 U.S.C. § 1715(b)(8) - any written judicial opinion relating to the materials described in 28 U.S.C. § 1715(b) subparagraphs (3) through (6)</u>.

On May 29, 2020, the Southern District of New York entered an order granting in part and denying in part Godiva's Motion to Dismiss, which is available at the website: www.cafanotice.com under the *Hesse v Godiva* folder as **Exhibit F.**

If you have any questions about this notice, the Action, or the enclosed materials, please contact the undersigned counsel for Godiva listed below

Very truly yours,

**PERKINS COIE LLP**

*/s/ Dennis C. Hopkins*
Dennis C. Hopkins
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
DHopkins@perkinscoie.com

David T. Biderman
1888 Century Park East, Suite 1700,
Los Angeles, CA 90067
DBiderman@perkinscoie.com

Thomas J. Tobin
1201 Third Ave., Ste. 4900
Seattle, WA 98101
TTobin@perkinscoie.com

Enclosures

Exhibit F

## EXCLUSIONS

1.  31213CJ9TYQVX          SUSAN HAGA

2.  31213CSNFS28F          NADIA HANCHARD

3.  31213GSSNQ437          JOSHUA COOLS

4.  31213HG6751P7          MADELINE AGADZHANOVA

5.  31213HHRGSCZS          DAVID MARTINSON

6.  31213HJHGZHM7          CAROLYN LOOMIS

7.  31213HMHSHP67          JOSEPH LALONDE

8.  31213HMJ4F852          DAVID COATNEY

9.  31213HMN1BM31          CJ GRUBB

10. 31213NZ3GVXT4          GARRETT MCCONNELL

11. 31213NZ8Y7DD5          LINDA CURTIS

12. 312130GPD3RDC          NIKIA DAVIS