

**1629 K STREET NW, SUITE 300**
**WASHINGTON, D.C. 20006**

Anna St. John
Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

April 11, 2022

**By ECF**
Hon. Loretta A. Preska
U.S. District Court, S.D.N.Y.
500 Pearl Street, Courtroom 12A
New York, NY  10007

   Re: *Hesse, et al. v. Godiva Chocolatier, Inc.*, No. 1:19-cv-0972-LAP

Dear Judge Preska:

  Class member and objector Eli Lehrer respectfully submits this response to the parties' proposed *cy pres* recipients as submitted to the Court as docket no. 118. The parties submitted their proposed recipients after the Court rejected the recipient they initially proposed, Public Justice Foundation, because of its work on polarizing issues and failure to commit to using the class funds it received as *cy pres* only for work involving consumer protection.

  While the three organizations proposed by the parties as a replacement *cy pres* recipient have promised that they will use any *cy pres* only to advance consumer rights and the amelioration of false advertising, Mr. Lehrer respectfully identifies other problems with the organizations that make them inappropriate recipients under Federal Rule of Civil Procedure 23. These problems show that *cy pres* to these organizations does not achieve the "next best" approximation of class member interests. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007). Instead, these organizations raise First Amendment and conflict-of-interest concerns and fail to provide relief to the class members whose recovery will fund the *cy pres* distribution.

  **National Consumer Law Center** ("NCLC") is an advocacy group that advances contentious public policy positions with which some class members, including Mr. Lehrer, disagree and that are of questionable benefit, at best, for consumers. For example, NCLC opposes the use of credit-based insurance scores to price auto and

homeowners' insurance. A consumer's insurance score generally is obtained through a statistical analysis of credit report information showing the relative likelihood of an insurance loss for someone with a similar credit report. By using these scores, insurers can offer lower insurance rates to those who present a lower risk rather than requiring them to subsidize those who present a higher risk of loss. NCLC, however, has taken the position that the use of such scores to lower low-risk policyholders' rates perpetuates racial and economic inequality and legislatures should limit the use of such scores.

NCLC's advocacy position is contrary to the research and advocacy work of The R Street Institute ("R Street"), the non-profit, nonpartisan organization where Mr. Lehrer serves as president. R Street has researched insurance policy since its founding in 2012, and has found that removing the ability of insurance companies to use credit information in risk ratings will increase premiums across the board. *See* Testimony from Sarah Wall, "In Opposition to Prohibiting Maryland's Insurance Companies from Using Credit Information in Risk Ratings," Before the Maryland House Comm. on Economic Matters, Feb. 17, 2022, *available at* https://www.rstreet.org/2022/02/15/in-opposition-to-prohibiting-marylands-insurance-companies-from-using-credit-information-in-risk-ratings/; *see also* Declaration of Eli Lehrer ¶¶ 4-5. NCLC's advocacy on this issue undermines the benefits of such scores for consumers, as the use of credit scores allows the market to better match the price of insurance with the risk profile of the consumer.

In addition, NCLC has filed amicus briefs espousing narrow conceptions of First Amendment and separation of powers principles and expansive concepts of class action *cy pres*. *See* Amicus Brief of NCLC and Berkeley Center for Economic Justice, *Seila Law LLC v. CFPB*, No. 19-7, (U.S. Jan. 22, 2020) (denigrating separation of powers theory that was subsequently adopted by Supreme Court); Amicus Brief of NCLC, *Frank v. Gaos*, No. 17-961 (U.S. Sept. 5, 2018).

NCLC's work on these contentious issues makes it unfit as a *cy pres* recipient in this case involving a large, nationwide consumer class of chocolate purchasers, many of whom do not support its advocacy positions. The selection of NCLC would violate the First Amendment rights of class members, as Mr. Lehrer discussed in his objection. The Court would be ordering funds that belong to class members to be paid to an organization that works to advance policies and laws that are opposed by and detrimental to at least some class members' interests without the class members' consent or even notice. *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing *ALI Principles* § 3.07 cmt. (b)).

Finally, NCLC is also problematic because of its ties with plaintiffs' counsel. NCLC and Faruqi & Faruqi served as co-counsel in *In re Bank of America Home Affordable*

*Modification Program (HAMP) Contract Litigation*, MDL No. 2193 (D. Mass.), the complaint for which is featured on NCLC's website. *See* https://www.nclc.org/images/pdf/litigation/boa-amended-consolidated.pdf. A "cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection … was made on the merits." *ALI Principles* § 3.07 cmt. b; *accord In re Google Inc. Cookie*, 934 F.3d 316, 331 (3d Cir. 2019) (adopting § 3.07 cmt. b standard). Without close analysis of such affiliations, "the cy pres doctrine … poses many nascent dangers to the fairness of the distribution process." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) (citing authorities). Co-counsel relationships usually involve intertwined financial incentives, with each counsel having an interest in remaining on good terms to create opportunities for future working relationships.

**Center for Science in the Public Interest** ("CSPI") also raises concerns as a *cy pres* recipient. The organization has been heavily criticized for spreading misinformation, relying on "junk science," publishing purported research that has not been peer reviewed, and using the resulting fear among consumers for fundraising purposes. *See* Alex Berezow, "CSPI Fundraising Letter Is Full of Biomedical Misinformation," American Council on Science and Health (Dec. 30, 2019), *available at* https://www.acsh.org/news/2019/12/30/cspi-fundraising-letter-full-biomedical-misinformation-14481. CSPI has even had to reverse course after the public learned that its junk science-based crusades were wrong. For example, in the 1980s CSPI attacked fast food restaurants' use of beef fat and palm oil to cook french fries, leading protest campaigns at restaurants and their corporate headquarters. As a result, most fast-food chains started cooking their fries in the only alternative oil—partially hydrogenated oil, which contains trans fats and which CSPI defended in its published reports. Now, however, CSPI insists that trans fats are responsible for tens of thousands of deaths a year and seeks to outlaw it. *See* "Center for Science in the Public Interest," Activist Facts, *available at* https://www.activistfacts.com/organizations/13-center-for-science-in-the-public-interest/.

Finally, **National Advertising Division of the Better Business Bureau** (the "BBB") raises concerns as a *cy pres* recipient because of the conflicts of interest within the organization inherent its funding arrangement that suggest consumer class members will not be the foremost beneficiaries of its work. The BBB is largely funded by dues payments from the businesses for which it provides accreditation and ratings and addresses consumer complaints. As Time Magazine pointed out, the organization is "not a consumer watchdog." Rather, "[t]he organization's customers are businesses, not taxpayers or consumers. How can the BBB serve as an honest broker between businesses and consumers when it is fully funded by one of these parties?" *See* Brad Tuttle, "Why the Better Business Bureau Should Give Itself a Bad Grade," Time (Mar. 19, 2013), *available at* https://business.time.com/2013/03/19/why-the-better-

business-bureau-should-give-itself-a-bad-grade/. An investigation by CNNMoney found such conflicts playing out: Many "companies boasting the BBB'S coveted A+ rating … pay thousands to the BBB each year for membership. Some even have founders or former CEOs facing years behind bars. Meanwhile, respected Fortune 500 companies, like Microsoft and Starbucks, don't pay the organization's membership fees and are among the BBB's lowest-rated companies." Even when some companies were "ruled flat-out scams and were shut down, [they] still kept their high BBB grade," despite government lawsuits and multimillion dollar penalties. *See*, Blake Ellis & Melanie Hicken, "Slammed by the government, A-Rated the Better Business Bureau," CNN Money (Sept. 30, 2015), *available at* https://money.cnn.com/2015/09/30/news/better-business-bureau/index.html#:~:text=The%20BBB%20has%20come%20under,under%20investigation%20by%20his%20office.

*          *          *

Mr. Lehrer respectfully suggests two alternatives to the *cy pres* recipients proposed by the parties that may be worthy recipients of any remaining class funds.

**Consumers' Checkbook**, a nonprofit organization with which he has no affiliation, provides consumers with ratings, reviews, and advice regarding service providers to empower consumers to make informed choices and to influence the marketplace for consumer services. The advantage of this organizations is that its work focuses on providing actual information to consumers, contrary to the more advocacy-focused organizations proposed by the parties. By providing information directly to consumers, Consumers' Checkbook can help consumer cut through any misleading or hyperbolic claims that service providers might include in their marketing. *See* http://www.checkbook.org.

**Escheat to the U.S. Treasury** is another potentially worthy option that avoids the First Amendment and conflict-of-interest concerns raised by certain proposed recipients and ensures equal benefit for the class. *See Hodgson v. YB Quezada*, 498 F.2d 5, 6 (9th Cir. 1974).

Respectfully submitted,

/s/ Anna St. John
Anna St. John
*Counsel for Objector Eli Lehrer*

cc:     All counsel of record (via ECF)